JACOB F. WYCKOFF, Appellant, *against* JAMES L. ANTHONY
*et al.*, Respondents.

(Decided December 6th, 1880.)

The allowance of days of grace for payment of a promissory note is an in-
dulgence established by commercial usage for the benefit of the debtor
alone; and a tender by him of the amount due upon his note, including
interest for the days of grace, is a good tender, although made at the time
fixed by the note for payment, and before the expiration of the days of
grace.

Where payment of a promissory note payable to a firm is tendered by a
check payable to a firm of which the payees are members, and which
had been formed by a change in their previous firm since the making of
the note, and the tender is refused without objection to the manner in
which the check is drawn, the refusal being put on other grounds, that
objection is waived.

A tender to one of two members of a firm entitled to payment is suffi-
cient.

When securities are specifically pledged to a broker or banker to secure the
payment of a particular loan or debt, he has no lien upon such securities
for a general balance, or for the payment of any other claim.

Where a tender of payment of a debt and a demand for bonds pledged to
secure it are duly made, and refused, and an action is thereupon brought
by the debtor against the creditors for a conversion of the bonds, the
tender is not waived by the plaintiff using the money and failing to bring
it into court, as the amount due and tendered is necessarily to be de-
ducted and allowed to the defendants in fixing the amount of damages.

In an action for the conversion of certain bonds, the answer set up, with
other defenses, the non-joinder as plaintiff of one G., alleged to be a part-
owner of the bonds. There had been previous dealings between the
parties in which the defendants had acted as brokers in purchasing
and carrying various securities, among which were the bonds in.question,
either for the plaintiff or for G. upon an individual account or an ac-
count kept by them for G. in the plaintiff's name, on which account the
plaintiff had advanced money, but G. was to have the profits. It ap-
peared, however, that the transaction out of which the action arose was
distinct and independent; the written evidence on the part of the plaint-
iff tended to show that the bonds alleged to have been converted had
been pledged to the defendants in the name of the plaintiff alone, to
secure payment of a note of which he was the maker; he testified that
he was and had remained the owner of the bonds, that they were bought
for him by G., through the defendants as brokers, that he paid for them

with his own money, and that G. was to have some of the profits, if any, and to share in the losses; while G. testified, that, in the purchase of the bonds, he acted as the plaintiff's agent, that the transaction with the defendants in the purchase and carrying of these bonds was by him personally, representing the plaintiff, and that the understanding in regard to them between the plaintiff and himself was that he should bear his proportion of the losses and profits also. *Held,* that to dismiss the complaint upon this evidence for non-joinder of G. as plaintiff was error, and that the question whether he was or was not a joint owner of the bonds was not for the court, but should be submitted to the jury.

APPEAL from a judgment of this court entered upon the dismissal of a complaint at the trial.

The action was brought to recover damages for the alleged conversion by the defendants of certain bonds, deposited with them by the plaintiff as collateral security for the payment of a promissory note made by the plaintiff payable to the defendants, the amount due upon which had been tendered by him to them, and the redelivery of the bonds to him demanded before the action. The facts are stated in the opinion. Upon the trial the complaint was dismissed, and judgment for the defendants was entered thereupon. From the judgment the plaintiff appealed.

*W. I. Butler,* for appellant.—The taking of days of grace is a privilege personal to the debtor, and not a right which the creditor can insist upon.

The assertion of an unfounded claim upon the bonds, and the refusal to deliver, except upon an unlawful condition imposed, amounted to a waiver of any tender or demand whatever; but both were regularly and lawfully made in person to each of the defendants.

The defendants, the payees of the note and the pledgees of the bonds, inasmuch as the pledge is specific, cannot retain the bonds pledged for this particular loan, for the further purpose of securing other debts or demands against the pledgor (2 Parsons Contr. 120; *Robinson* v. *Frost,* 14 Barb. 536; *Jarvis* v. *Rogers,* 15 Mass. 389; *Rushford* v. *Hadfield,* 7 East, 224; *Lane* v. *Bailey,* 47 Barb. 395; *Grant* v. *Taylor,* 35 N. Y.

Super. Ct. [3 Jones & S.] 338). It was not incumbent on the plaintiff to show that the additional demand made by the defendants was unfounded ; it was for them to establish their additional claim on the bonds by showing the existence of such claim, and a lien upon the bonds for it.

It was not necessary to keep the tender good. Defendants are entitled to an abatement of damages to the extent of the lien as it existed at the time. The tender terminated the lien.

There was no non-joinder of parties plaintiff. The right to the possession at the time of the conversion of the property converted is all that is essential to give a right of action (Abbott's Trial Evid. 623, 688 ; *Van Bokkelin* v. *Ingersol*, 5 Wend. 315 ; *Baker* v. *Hoag*, 7 N. Y. 555 ; *Faulkner* v. *Brown*, 13 Wend. 63 ; *Hendricks* v. *Decker*, 35 Barb. 298 ; *Bowen* v. *Fenner*, 40 Barb. 383 ; *Haddon* v. *Williams*, 1 Robt. 340 ; *Fitzhugh* v. *Wyman*, 9 N. Y. 559 ; *Johnson* v. *Carnley*, 10 N. Y. 570). A bailee is not permitted to dispute the title of the bailor or principal from whom he received the property except by showing that the bailor has parted with his interest in the property subsequently to the bailment (Abbott's Trial Evid. 554 ; *Vosburgh* v. *Huntington*, 15 Abb. Pr. 254 ; *Marvin* v. *Ellwood*, 11 Paige, 365 ; *Gosling* v. *Birnie*, 7 Bing. 339 ; *Nudd* v. *Montanye*, 38 Wis. 511 ; *Marvin* v. *Smith*, 56 Barb. 600).

*D. M. Porter*, for respondent.—No tender was made. The creditor cannot be compelled to receive his money, drawing interest, before maturity (*Butts* v. *Burnett*, 6 Abb. Pr. N. S. 302 ; *Sanders* v. *Frost*, 5 Pick. 259, 267 ; *Tillou* v. *Britton*, 4 Halst. 120, 127 ; 2 Parsons Contr. 642, note g ; *Mitchell* v. *Cook*, 29 Barb. 243 ; *Everton* v. *National Bank of Newport*, 66 N. Y. 14).

The tender was insufficient in amount (*Boyden* v. *Moore*, 5 Mass. 365 ). Neither was the tender kept good (*Dodge* v. *Fearing*, 19 Hun, 277 ; *Roosevelt* v. *Bull's Head Bank*, 45 Barb. 579 ; *Becker* v. *Boon*, 61 N. Y. 317; *Brooklyn Bank* v. *De Graw*, 23 Wend. 342).

There was a non-joinder of parties plaintiffs, because Gilman

was to share the profits and bear his part of the losses, which constituted him a copartner, and as such a necessary party plaintiff; especially as defendants were third parties dealing with them (*Manhattan Brass Manuf. Co.* v. *Sears*, 45 N. Y. 397; *Berthold* v. *Goldsmith*, 24 How. [U. S.] 536, 542, 543; *Ontario Bank* v. *Hennesy*, 48 N. Y. 545; *Pond* v. *Pittard*, 3 Mees. & W. 357; *Haas* v. *Roat*, 16 Hun, 526; *Pott* v. *Eyton*, 3 Mann. Gr. & S. 32; 54 Eng. C. L. 31; *Grace* v. *Smith*, 2 Wm. Blackst. 998; *Waugh* v. *Carver*, 2 H. Blacks. 247; 1 Smith's Lead. Cas.; *Leggett* v. *Hyde*, 58 N. Y. 272; Collyer Part. 4th Am. ed. § 5, and cases cited; Story Part. Gray's ed. §§ 2, 68, 36, note 3; *Walden* v. *Sherburne*, 15 Johns. 409; *Dobb* v. *Halsey*, 16 Johns. 34; *Everett* v. *Chase*, 5 Denio, 182; *Winship* v. *Bank of United States*, 5 Pet. 529, *Everett* v. *Chapman*, 6 Conn. 347; *Champion* v. *Bostwick*, 18 Wend. 175; Lindley Part. § 17).

The defendants claimed a lien upon the bonds as general bankers, and it is incumbent on the plaintiff to show that this claim was entirely fictitious (*Briggs* v. *Boyd*, 56 N. Y. 289; *James* v. *Johnson*, 6 Johns. Ch. 428; and authorities cited).

The plaintiff having used the money, and not bringing it into court, waived the tender (*Tillou* v. *Britton*, 4 Halst. 120, 127; *Kortwright* v. *Cady*, 23 Barb. 490; 5 Abb. Pr. 358; *Brooklyn Bank* v. *Degraw*, 23 Wend. 342).

CHARLES P. DALY, Chief Justice.—It was stated on the argument, that the complaint was dismissed by the judge below, solely on the ground that Gillman was not joined as a party plaintiff; and that the judge ruled against the defendants on the five other grounds on which they moved for the dismissal of the complaint. As this, however, does not appear in the case as settled, we shall have to consider all the grounds on which the motion was made; for, if any of them should be good, the judgment would have to be affirmed. It would be convenient to consider last, the ground upon which the judge is said to have dismissed the complaint; and I shall therefore consider first, in their order, the other grounds.

Wyckoff *v.* Anthony.

The first is that, at the time of the tender, the note was not due, as the three days of grace had not expired.

A creditor is not compelled to receive money, bearing interest, before it is due; for he has a right, by his contract, to keep his money at interest, and cannot be compelled to receive it before the time fixed by the contract. This rule applies to a promissory note made payable at a particular day; but it does not apply to the days of grace, which is an indulgence established by commercial usage for the benefit of the debtor alone, and which, in the opinion of elementary writers (Byles on Bills, 205, 6th Am. ed.; Chitty on Bills, p. 374, 10 Am. ed.)—for the origin of the usage is somewhat obscure—was at first allowed as a favor, on the part of the creditor, but gradually, in commercial countries, ripened into a right; an allowance which varies according to the usage of the particular country or place, from three days to thirty, and in some places, does not exist at all. " Days of grace," says Chief Justice MARSHALL, in *Ogden* v. *Saunders* (12 Wheat. 342), " from the very term, originated partly in convenience, and partly in the indulgence of the creditor." The practice of allowing a little time to the debtor, for payment, beyond the time named in the bill, doubtless originated from the difficulty and irregularity which, in early times, attended the transmission of money, or getting money exchanged into the coin which was alone receivable in the place where the bill was payable, when the conveniences of modern times did not exist; such as post-offices, post roads, and the facilities which we now have in all matters of exchange, and the transmission of money by bills of credit from one commercial place or house to another. It was a usage derived from Saxon or remoter times, that parties were not to be strictly held to the precise time appointed for an act; and by the feudal law, a party was allowed three distinct days, or, as they were called in the old books, three days of grace, in which to make his appearance, beyond the day named in the writ (3 Blackst. Comm. 278); and, no doubt, it was the general prevalence of this custom, in England, under the feudal law, which led to the commercial usage of allowing three days also, for the payment of bills of exchange or promissory notes, beyond

the time fixed ; which, as I have said, widely differs in different countries ; thus, in Spain, it is generally fourteen days, but differs in certain parts of the country, as in Cadiz, where but six days are allowed ; these regulations, in different places, being founded upon considerations peculiar to the particular place or country, its manner of doing business, the want of regular communication between different parts, and the interruptions or delays incident to it, or other causes; but wherever the usage prevails, it is an indulgence to the debtor, of which he has a right to avail himself ; and being so, I see no reason why he should not have the right to pay his bill or note, if he thinks proper, after the time fixed for payment and before the expiration of the days of grace, to which he is entitled. But, in any point of view, all that the creditor could possibly claim, would be his interest up to the last day of grace ; and in this case, the amount tendered to the defendants covered that interest, and a fraction over. Gilman swears that the amount of interest which the defendants claimed was $82.44 ; and that the amount tendered was $82.50. There was, therefore, nothing in this objection.

The next objection is that the check tendered was made payable to the firm of Anthony, Poore & Oliphant ; the firm having been changed on the first of January, or about a month before the tender was made, from a firm previously composed of the two defendants, Anthony & Oliphant. The answer to this objection is, that the defendant, Anthony, made no objection to the check upon this ground, but put his objection to delivering the bonds upon another ground ; that he was entitled, before delivering them, to be paid for a loss sustained upon the sale of certain stock, which Gilman had ordered to be bought, and afterwards repudiated ; and his objection being put solely upon this ground, the objection to the manner in which the check was drawn must be considered as waived, because, if it had been made, that could have been immediately obviated by Gilman's getting a check drawn payable to the order of the previous firm (Per S. B. STRONG, J., in *Mitchell* v. *Cook*, 29 Barb. 253) ; in addition to which, a tender of the full amount due upon the note and interest was afterwards

made in specie to the other defendant, Oliphant; and a tender to one of the two members of the firm was sufficient.

The fourth ground, that the plaintiff never had any title to the bonds, is involved in the last objection, and will be subsequently considered.

The fifth ground was, that Anthony & Oliphant claimed to hold the bonds until they were paid $702, for the loss upon the stock transaction previously referred to. This was substantially claiming that they had a general lien as brokers or bankers, upon these particular bonds, for any amount that might be then due to them; the answer to which is, that this was a specific pledge of twenty bonds, for the payment of a particular debt or note, and that where securities are thus pledged to a broker or banker, to secure the payment of a particular loan or debt, he has no lien upon such securities for a general balance, or for the payment of any other claim (*Vandersee* v. *Willis*, 3 Bro. C. C. 21; *Davis* v. *Bowsher*, 5 Term, 488; Cross on Liens, 316; *Lane* v. *Bailey*, 47 Barb. 395; 2 Parsons on Contracts, 120). But independently of that, the court could not assume that the defendants had any such claim, for, in that stage of the case, it rested entirely on the testimony of Gilman; and his testimony was that they made such a claim, but that it was unfounded, as he had given no order for the purchase of the stock on which the defendants claimed to have sustained a loss of $702. To have dismissed the complaint on this ground, would have been, on the part of the judge, to have held that it was established, by the uncontradicted evidence given on the part of the plaintiff, that they, defendants, had a valid claim against the plaintiff for $702; and that they had a right to retain the bonds until it was paid; for which there was no foundation whatever in the evidence.

The sixth point is that the tender was waived by using the money, and not bringing it into court; which point, according to my recollection, respondents waived on the argument; but if they did not, there is nothing in it; for this is an action to recover damages for the conversion of the bonds, and the amount due and tendered is necessarily to be deducted and allowed to the defendants, in fixing the amount of damages.

The remaining point is, whether the action was properly brought, without joining Gilman as a party plaintiff? I think it was. The bonds were pledged to the defendants in the plaintiff Wyckoff's name alone; the account with the defendants was in his name, and he was the maker of the note, for the payment of which the bonds were pledged with the defendants, as collateral security. So far as the transaction appears on the face of the written memorandum and note, it is a promise by him to pay the amount of the note, and a statement that he has deposited with the defendants, the twenty bonds as collateral security for the payment of it; authorizing them to sell the bonds, on the non-performance of his promise; and to apply the net proceeds of such sale to the payment of the note and interest, accounting to *him* for the surplus, if any. This shows, upon the written evidence of the transaction, that he was entitled, on the payment of the note, to the possession of the bonds; and a party who is simply entitled to the possession of property may maintain an action for the conversion of it, against any one who is not the owner, or entitled to the possession. A gratuitous bailee, or one who is in possession of an estray, or who has a lien, or who can show that he was, at the time of the conversion, lawfully entitled to have the property in his possession, may sue for the conversion of it (*Bowen* v. *Fenner*, 40 Barb. 385; *Hendricks* v. *Decker*, 35 Barb. 299; *Baker* v. *Hoag*, 7 N. Y. 555; *Johnson* v. *Carnley*, 10 N. Y. 570).

If it had appeared by the evidence that the agreement or understanding between Wyckoff and Gilman was, that on the payment of the note, either he or Wyckoff might have possession of the bonds, and that either had the right to control and sell and dispose of them, then they would have been partners in the adventure, and the suit would have to be brought in the name of both. But the evidence does not show this, with that certainty that is requisite to justify dismissing the complaint, upon the ground that Gilman was a joint owner and ought to have been made a party plaintiff. On the contrary, the plaintiff Wyckoff testifies, that he was the owner of the bonds, and that he remained the owner of them up to

the time of the maturity of the note, in which he is supported by the evidence of the written contract.  He says that he did not buy them himself personally; that they were bought by Gilman, but that he, Wyckoff, paid for them, with his own money, "every cent of it;" that Gilman was to have some of the profits, if there were any, and was to share in the losses; an arrangement, he says, that continued "through the purchase of all the bonds," including those in suit; that the defendants were employed as his, Wyckoff's, brokers in the purchase of these bonds; and that so far as the defendants paid for any of the bonds, they did so as his brokers; that Gilman attended to the buying, and that the account with the defendants in these dealings was kept in his, Wyckoff's, name, and never in the name of Gilman.  Gilman testifies, that in the purchase of these bonds, he acted as the plaintiff's agent; that the transaction with the defendants in the purchase and carrying of these bonds was by him personally, representing the plaintiff.  The account which he gives of the purchase of the twenty bonds in controversy, is this: that he had information which led him to believe that these bonds were very valuable; that he went to the plaintiff, and told him that he believed they were going a great deal higher; that he gave him the information he had obtained, and asked him if he would buy them, and give him a proportion of the profits; and that the plaintiff, after thinking over the matter for a day or two, told him that he would do so; and that the understanding was that he, Gilman, "*should bear his proportion of the losses, and profits also.*"  It further appears by his testimony, that the defendants were his, Gilman's, brokers; that he had an individual account with them and also a stock account with them, kept in the plaintiff's name, on which the plaintiff had loaned Gilman $10,000, under agreement with the defendants, that the profits were to belong to Gilman, but that the plaintiff was to have a lien on the account, to the extent of the $10,000, which was to be repaid him, before Gilman was to have any claim upon the account against the defendants.  It also appears that Gilman bought other bonds, the profit on the sale of which belonged to him, but which were bought in the plaintiff's name, as security for a loan made

by him to Gilman, and which was included in the above-mentioned stock account; Gilman keeping two accounts for himself with the defendants, one in his individual name, and one in the name of Wyckoff; which latter account embraced the stocks and bonds, of which he was to have the whole profit.  It also appears that the twenty bonds in suit were separated from other bonds, so as to obtain a loan of $18,000, $8,000 of which was loaned by the defendants, and $10,000 by the First National Bank; that, to effect this, all the bonds in the defendants' office were taken up, and the loan by the bank, of $10,000, was secured by twenty-five bonds; and the loan by the defendants, by the twenty bonds in suit; which arrangement left the plaintiff in debt to the defendants in $3,267, for which he gave them his check; so that whatever may have been the previous state of affairs, this was a distinct transaction; an obligation by the plaintiff to pay the defendants $8,000, for which he gave them, as collateral security, the twenty bonds in suit; and the evidence, in my opinion, does not warrant the conclusion, as a conclusion of law, that Gilman had such a claim or right to the possession or control of these bonds, as made it obligatory upon the plaintiff to bring the action, for, the recovery of the value of them, in the joint names of Gilman and himself; thus acknowledging Gilman's joint proprietorship in them.   They were bought and paid for by the plaintiff's money.   They were held by the defendants as collateral security for a debt incurred by and payable to the defendants by the plaintiff only; and the extent of the interest which Gilman had in them, was an understanding between him and the plaintiff, that he was to have some of the profits on the sale of them, if there were any, and share in the losses; or, as Gilman puts it " Gilman was to bear his proportion of the losses and the profits also."

A mere community of interest in property, or an agreement simply to divide profits, or an agreement to bear a certain part of the losses, does not necessarily, of itself, create the relation of partners. Whatever may be the effect of the act of parties having a community of interest in property, or agreeing to divide the profits arising from it, or to bear a part of the losses, as respects the rights of third persons, they cannot, as between themselves,

be made to assume a relation to each other, which they did not intend, because a partnership *inter se* can result only from the intention of the parties, to be gathered from the contract, if there be one; or, if not, from their relations to and dealings with the property, and with each other.    To constitute it, there must be a joint interest in the property; a right to share the profits of the adventure, and a right of control over the property or business, all of which, in the absence of a special contract, are necessary elements to create a partnership, as be· tween the parties (1 Wood's Collyer on Part. pp. 7, 8, 9, 10, notes; *Salter* v. *Ham*, 31 N. Y. 321; *Pinckney* v. *Keyler*, 4 E. D. Smith, 467; *Moss* v. *Jerome,* 10 Bosw. 225; *Chase* v. *Barrett*, 4 Paige, 148; *Snell* v. *De Land*, 43 Ill. 323; *Barthold* v. *Goldsmith*, 24 How. [U. S.] 541, 542, 543.  " Whether two or more persons are partners as between themselves," says WRIGHT, J., in *Salters* v. *Hume* (*supra*), " is determinable chiefly by a reference to their own intention;" and applying that test here, it is evident that the parties did not understand that they were or intended to become partners in the purchase and sale of the twenty bonds, for Gilman's understanding was, as he testifies, that he was acting as the plaintiff's agent in the transaction; and the plaintiff has testified that he was the owner of the bonds; that he paid for them with his own money, and continued to be the owner of them when the note became payable, February 14, 1880.   There is nothing in the evidence to show, or from which it can be inferred, as a fact, that Gilman had or was to have the same·control over the bonds, and right to sell them, that the plaintiff had; and unless this was the case, the plaintiff and Gilman were not partners *inter se*.

Even if these twenty bonds had been put in the stock and bond account, kept in Wyckoff's name by Gilman, all the profits of which were to belong to Gilman, Gilman was to have no profits under that account until the money advanced by the plaintiff, as a margin for the defendants in carrying the stock and bonds in that account, was repaid to the plaintiff by the defendants.   If these bonds, therefore, were put by Gilman in that account, they were not subject to it, for under that all the

profits of the sales belonged to Gilman alone; and the testimony of both Gilman and the plaintiff is, that these bonds belonged, not to Gilman, but to the plaintiff. Gilman swears positively that the bonds taken up, which led to the making of the plaintiff's note, and the giving of the twenty bonds in suit, as collateral security for the payment of the note, was an independent transaction; that Wyckoff gave him the money to take up the bonds, under, as he said in response to a question put by the defendants' counsel, an arrangement that he and the plaintiff were to divide the profits and share half the losses. The plaintiff's testimony, however, is different. It is that Gilman was to have some of the profits, if there were any, and he was to share in the losses; which might mean that, if there were no profits, he would share in the losses, as he would then get nothing for his time or labor, in which case it is clear that there would be no partnership; for a person rendering service, for which he is to be paid a proportional part of the profits of the business or adventure, is a mere agent or servant of the owner, having no interest in or control over the property or business from which the profits arise, or any interest in the profits as profits, but only as a measure of compensation (*Ogden* v. *Astor*, 4 Sandf. 321, 322; *Barthold* v. *Goldsmith*, 24 How. [U. S.] 543), which may have been the case here. The difference between the statement of the plaintiff and of Gilman on this point is a material one; and the judge could not decide which of the statements was true, or the more probable, as that would necessarily be a question, not for the court, but for the jury.

After going over the whole of the evidence in this case, and viewing it in its various aspects, I am of the opinion that the question whether Gilman was, or was not, a joint owner of these bonds, was a question, not for the court, but one which, on the whole evidence, had to be submitted to the jury. I think, therefore, that a new trial should be granted.

J. F. Daly and Van Hoesen, JJ., concurred.

Judgment reversed and new trial ordered, with costs to abide event.